IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTINE GRANT, and STEVEN GRANT,

        Plaintiffs,

vs.

I-FLOW CORPORATION, a Delaware corporation,

        Defendant.

Case No.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs KRISTINE GRANT and STEVEN GRANT, wife and husband (collectively, "Plaintiffs"), by and through their undersigned counsel, sue Defendant I-FLOW CORPORATION ("I-Flow") and state:

### Jurisdiction and Venue

1. This Court has subject matter jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1332 because all parties to this action are citizens of different states and this is an action for damages in excess of Seventy-Five Thousand and NO/100 Dollars ($75,000.00), exclusive of interest and costs.

2. This Court has personal jurisdiction over I-Flow pursuant to Fla. Stat. § 48.193 in that at all relevant times I-Flow (a) conducted and carried on business in the state of Florida; (b) committed a tortuous act within the state of Florida; and (c) caused injury within the state of Florida.

3. Venue is proper in this Court because the product which caused the injury to Plaintiffs was marketed, sold, and used in Pinellas County, Florida and the surgery in which the product at issue was used occurred in Pinellas County, Florida.

### Parties

4. At all times material hereto, Plaintiffs were and are citizens of the State of Florida and residents of Pinellas County, Florida.

5. At all times material hereto, Defendant I-Flow was and is a foreign profit corporation organized under the laws of Delaware with its principal place of business located in Lake Forest, California. I-Flow was and is engaged in the marketing and selling of medical devices in the State of Florida, among others, including the On-Q Painbuster® pain pump.

### Factual Allegations

6. At all relevant times, I-Flow, or one of its subdivisions, agents, or alter egos, designed, tested, manufactured, assembled, labeled, marketed, sold, and distributed a product called the On-Q Painbuster® pain pump (the "On-Q pain pump"), which is a medical device intended to deliver, via catheter, a continuous dose of pain relief medication directly into the operative site immediately following shoulder surgery.

7. The On-Q pain pump is designed and intended to be used with commonly used anesthetics such as lidocaine or marcaine, with or without epinephrine, in large volumes over the course of two days or more.

8. The continuous injection of such medications at such doses over time directly into the shoulder joint can cause serious and permanent damage to the cartilage of the

shoulder joint and surrounding tissues, such as chondrolysis, a complete or nearly complete loss of cartilage in the shoulder joint.

9. The U.S. Food and Drug Administration ("FDA") has issued a report warning healthcare professionals "to not use [pain pumps] for continuous intra-articular infusion of local anesthetics after orthopedic surgery." In the same report, the FDA stated that it "has not cleared any [pain pumps] with an indication for use in intra-articular infusion of local anesthetics."

10. On information and belief, the label and/or packaging for the On-Q pain pump stated that the indications for use of the pain pump included use in the intra-operative site.

11. For orthopedic surgeons, when an orthopedic surgery occurs in the joint space, an indication for use in the "intra-operative site" means the intra-articular site (*i.e.*, inside the joint space). Accordingly, the label and/or packaging for the On-Q pain pump was misleading to orthopedic surgeons who were not told the FDA had refused to approve that interpretation of indications for use.

12. I-Flow did not warn Mrs. Grant or her surgeon about the unreasonable risks and dangers of using the On-Q pain pump in the shoulder joint.

13. On or about September 26, 2006, Plaintiff Kristine Grant ("Mrs. Grant") underwent surgery on her left shoulder. At the conclusion of the surgery, an I-Flow On-Q Painbuster pain pump catheter was inserted into Mrs. Grant's left shoulder. Mrs. Grant's surgeon used the On-Q pain pump in the manner instructed and directed by I-Flow.

14. Following surgery, the cartilage in Mrs. Grant's left shoulder degenerated.

15. The On-Q pain pump used immediately after Mrs. Grant's surgery caused the degeneration of Mrs. Grant's shoulder cartilage.

16. As a result of the post-operative injury to her left shoulder, Mrs. Grant has suffered and will continue to suffer severe pain, mental and emotional distress, discomfort, substantial alteration of lifestyle, loss of enjoyment of life, and other problems.

17. As a further result of this injury, Mrs. Grant has been required to employ the services of doctors, nurses, physical therapists, and other medical personnel for care and treatment, has incurred medical expenses related to her care and treatment, and will be required to incur such expenses in the future.

18. As a further result of this injury, Mrs. Grant has suffered, and will continue to suffer, lost income due to the interference that the post-operative injury caused by the On-Q pain pump has caused in Mrs. Grant's occupation.

19. I-Flow's directors and officers have acted with gross negligence in designing, manufacturing, inspecting, testing, packaging, labeling, distributing, and marketing the On-Q pain pump and such conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct, including Mrs. Grant.

20. Evidence of the gross negligence of I-Flow's directors and officers includes, but is not limited to, the following:

    a. Because of a lack of studies demonstrating safety, the FDA twice denied I-Flow's request for an intra-articular use indication for I-Flow's pain pump. Robert Bard, I-Flow's Vice President of Regulatory and Legal Affairs, and Shane Noehre, I-Flow's

Director of Regulatory Affairs, each had actual knowledge that the FDA had denied – on multiple occasions – I-Flow's application to market its pain pump for use within the joint.

    b.  I-Flow never studied or commissioned a study to determine the safety of its infusion pain pumps using commonly used anesthetics in shoulder joint spaces. Discussions were held over several months between, among others, Shane Noehre, I-Flow's Director of Regulatory Affairs, Alan Dine, I-Flow's Director of Clinical Research, and Roger Massengale, I-Flow's Vice President of Marketing and Business Development, regarding whether to commission such a study. The aforementioned directors and officers ultimately chose not to commission such a study.

    c.  I-Flow first received reports of chondrolysis in July 2004 from its sales representative, Cheryl Pritchard, who advised Alan Dine, I-Flow's Director of Clinical Research, that Dr. James Andrews had eight college-age patients who developed shoulder chondrolysis following use of a pain pump. Mr. Dine chose not to investigate these reports; indeed, he chose not to follow up with Ms. Pritchard regarding these complaints, and he chose not to attempt to contact Dr. Andrews regarding these complaints.

    d.  In March 2006, Dr. Brent Hansen presented his research results to the American Academy of Orthopaedic Surgeons (AAOS). Dr. Hansen's research results demonstrated a link between intra-articular pain pump use and the incidence of shoulder chondrolysis. I-Flow's officers and directors, including Alan Dine, I-Flow's Director of Clinical Research, Roger Massengale, I-Flow's Vice President of Marketing and Business Development, and Barbara Saint John, I-Flow's Director of Sales Training, had actual knowledge of Dr. Hansen's presentation and his research results. Following presentation of

these research results, the aforementioned officers and directors, among others, chose not to perform additional research, did not issue a warning to physicians, and chose not to send a Dear Doctor letter.

     e.    I-Flow changed its package insert later in the fall of 2006, knowing that the new product insert would not accompany the product until the next year. I-Flow did not recall a single pain pump with the old package insert. Further, I-Flow never advised physicians, once the new label came out, about the need to read the label for new safety information, or that the label had been changed. I-Flow's officers and/or directors had actual knowledge of I-Flow's failure to recall pumps with the old package insert and failure to advise physicians regarding the new package insert. Further, I-Flow's officers and/or directors confirmed and accepted I-Flow's failures in this regard.

     f.    Although I-Flow had the capacity to use vendors to reach out to all orthopedic surgeons nationally, I-Flow's officers and/or directors chose not to send out any Dear Doctor or Dear Healthcare Professional letters to surgeons or hospitals.

## FIRST CAUSE OF ACTION
### (Strict Products Liability)

21.    Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 20 above as if fully set forth herein.

22.    I-Flow designed, tested, manufactured, assembled, labeled, marketed, distributed, and sold the On-Q pain pump.

23.    The On-Q pain pump was defective, unreasonably dangerous, and unsafe in that, among other things:

4841-4271-7959.1

a. The On-Q pain pump was defectively designed and manufactured, in that the continuous delivery of post-surgical anesthetic solution at the delivery rates achieved by the On-Q pain pump can cause destruction of cartilage; and

b. I-Flow failed to provide adequate warnings and instructions concerning the risks presented by continuous delivery of post-surgical anesthetic solution, at the delivery rates achieved by the On-Q pain pump, into the shoulder joint space.

24. The defects in the On-Q pain pump made the product unreasonably dangerous.

25. The defects in the On-Q pain pump and its component parts existed when the On-Q pain pump left I-Flow's control.

26. The use of the On-Q pain pump in the shoulder joint space was reasonably foreseeable by I-Flow.

27. The On-Q pain pump did not perform as safely as an ordinary customer would have expected when used as intended.

28. The On-Q pain pump and its component parts were expected to and did reach the ultimate user without alteration or modification (*i.e.*, without substantial change in the condition in which they were sold and distributed).

29. The danger posed by the defective condition of the On-Q pain pump and its component parts was not readily recognizable by the ordinary user of the On-Q pain pump.

30. I-Flow knew, or in the exercise of reasonable care could have known, that users of the On-Q pain pump would not realize the dangerous condition of the On-Q pain pump and its component parts.

4841-4271-7959.1

31.  The defects in On-Q pain pump and its component parts, and the On-Q pain pump's failure to perform safely, were a substantial factor in, and the proximate cause of, the injuries and damages suffered by Mrs. Grant, which include, but are not limited to, severe physical pain, mental suffering, inconvenience, loss of the enjoyment of life, past and future loss of income, and past and future medical, surgical, and related expenses.

## SECOND CAUSE OF ACTION
### (Negligence)

32.  Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 31 above as if fully set forth herein.

33.  At all relevant times, I-Flow had a duty to use reasonable care in the design, testing, manufacture, inspection, assembly, labeling, marketing, distribution, and sale of the On-Q pain pump.

34.  At all relevant times, I-Flow knew, or in the exercise of reasonable care could have known, that the On-Q pain pump was a device of such a nature that, if not properly designed, manufactured, inspected, tested, packaged, labeled, distributed, and marketed, was likely to cause serious bodily harm to Mrs. Grant when used in the manner reasonably foreseeable to I-Flow.

35.  I-Flow failed to exercise reasonable care in the design, manufacture, inspection, testing, packaging, labeling, distribution, and marketing of the On-Q pain pump. I-Flow's negligence includes, but is not limited to, the following:

   a.  I-Flow negligently designed or manufactured the On-Q pain pump and knew, or in the exercise of reasonable care could have known, that the On-Q pain pump was likely to be dangerous for the use for which it was supplied;

4841-4271-7959.1

    b.    I-Flow failed to conduct a proper assessment and analysis of the design and assembly of the On-Q pain pump or its component parts;

    c.    I-Flow failed to properly test or inspect the On-Q pain pump in the environment in which it was to be used to ensure that the On-Q pain pump would be safely used in a manner and for a purpose for which it was made;

    d.    I-Flow knew, or in the exercise of reasonable care could have known, that those using the On-Q pain pump would not realize its dangerous condition;

    e.    I-Flow failed to exercise reasonable care to inform or warn consumers, medical personnel, and end users of the defects of the On-Q pain pump;

    f.    I-Flow knew, or in the exercise of reasonable care could have known, about the risks the On-Q pain pump presented, and specifically the risk of cartilage and tissue damage that could result from dosage of a post-surgical anesthetic solution administered at a controlled and high rate, and I-Flow nonetheless failed to recall the On-Q pain pump or failed to provide adequate post-marketing warnings and instructions to physicians and medical providers using the On-Q pain pump.

36.    A reasonable manufacturer, distributor, or seller, under the same or similar circumstances as those described above, would have warned Mrs. Grant and her surgeon of the danger involved with the defects in the On-Q pain pump and would have provided instructions to Mrs. Grant and her surgeon regarding the safe use, if any, of the On-Q pain pump.

37.    I-Flow's negligence in the design, manufacture, inspection, testing, packaging, labeling, distribution, and marketing of the On-Q pain pump was a substantial

4841-4271-7959.1

factor in, and a direct and proximate cause of, Plaintiff's injuries and damages, which include, but are not limited to, severe physical pain, mental suffering, inconvenience, loss of the enjoyment of life, past and future loss of income, and past and future medical, surgical, and related expenses.

### THIRD CAUSE OF ACTION
### (Loss of Consortium)

38. Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 37 above as if fully set forth herein.

39. At all times material hereto, Plaintiff Steven Grant ("Mr. Grant"), was and is the spouse of Mrs. Grant, and as such, was and is entitled to the comfort, enjoyment, society, and services of Mrs. Grant.

40. As a direct and proximate result of the injury Mrs. Grant sustained from the aforesaid negligence on behalf of I-Flow, Mr. Grant has been denied the services, attentions, and consortium of Mrs. Grant, and has suffered and will continue to suffer economic loss, and has otherwise been emotionally and economically injured. Those losses will continue in the future.

41. Mrs. Grant's injury and damages are permanent and will continue into the future.

42. For the reasons set forth herein, Mr. Grant suffered and will continue to suffer the loss of his loved one's support, companionship, services, society, love and affection.

WHEREFORE, Plaintiffs pray for relief against I-Flow as follows:

1. On behalf of Mrs. Grant:

        a.      For an award for personal injuries, severe physical pain, mental suffering, inconvenience, loss of the enjoyment of life, and other general and noneconomic damages for past and future pain and anguish, in a sum to be the subject of proof at trial; and

        b.      For an award of special (economic) damages incurred including, but not limited to, past and future loss of income, and past and future medical, surgical, and related expenses;

2.    On behalf of Mr. Grant:

        a.      For an award of compensatory damages for loss of consortium, in a sum to be the subject of proof at trial;

3.    On behalf of Plaintiffs:

        a.      For an award, in addition to actual damages, of damages to make an example of and punish I-Flow, based upon the acts and omissions showing that I-Flow's officers and/or directors have acted with gross negligence;

        b.      For costs of suit incurred herein; and

        c.      For such other and further relief as the court may deem proper.

## **DEMAND FOR JURY**

Plaintiffs request a jury trial in this case.

4841-4271-7959.1

Dated: September 24, 2010

Respectfully submitted,

s/ **Shirin M. Vesely**
Shirin M. Vesely, Trial Counsel
Fla. Bar No. 021156
Keane, Reese, Vesely & Gerdes, P.A.
The Veritas Courtyard
770 Second Avenue South
St. Petersburg, Florida 33701
Telephone: (727) 823-5000
Fax: (727) 894-1023
E-mail: Svesely@krv-lawfirm.com

ATTORNEYS FOR PLAINTIFFS
KRISTINE GRANT AND STEVEN GRANT

4841-4271-7959.1